UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

LISA SULLINGER,                          )
                                         )
        Plaintiff,                       )        Civil No. 12-231-GFVT
                                         )
V.                                       )
                                         )
MICHAEL J. ASTRUE[1],                    )        **MEMORANDUM OPINION**
Commissioner of Social Security,         )        **&**
                                         )        **ORDER**
        Defendant.                       )
                                         )


*** *** *** ***

        The plaintiff, Lisa Sullinger, brought this action pursuant to 42 U.S.C. §§ 405(g)

to obtain judicial review of an administrative decision of the Commissioner of Social

Security ("Commissioner") denying her application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). The Court, having reviewed the

record and for the reasons stated herein, will deny Sullinger's Motion for Summary

Judgment [R. 14], and grant that of the Commissioner [R. 15].

**I**

        Sullinger alleges disability, beginning on November 1, 2006, due to a torn rotator

cuff, back pain, arthritis, depression and bipolar disorder. [R. 14 at 2; Transcript ("Tr.")

218, 222.] She protectively filed her applications for DIB and SSI on July 3, 2008. [Tr.

12, 218, 222.] Her application was initially denied on December 4, 2008 [Tr. 12, 119,

---

[1] As pointed out by the SSA in their brief, Carolyn W. Colvin became the acting commissioner on
February 14, 2013. Carolyn W. Colvin should, therefore, be substituted as the proper Defendant in
this action.

123] and again upon reconsideration on June 12, 2009. [Tr. 12, 116, 117.] An Administrative hearing was conducted before Administrative Law Judge ("ALJ") Deborah Smith on December 16, 2010. [Tr. 53-71.] Because of issues related to weather and timing, the parties were not able to conclude the hearing so a supplemental hearing was deemed necessary. The second hearing was held on June 16, 2011, but was immediately continued because the Medical Expert ("ME") was not available. [Tr. 77-78.] The third, and final, hearing was held before ALJ Smith on June 29. [Tr. 80-114.] At this hearing, ME Arthur Lorber and Vocational Expert ("VE") Robert Breslin appeared as witnesses. [Tr. 99-106, 106-114.] On July 18, ALJ Smith issued a decision denying DIB and SSI to Sullinger. [Tr. 9-28.] Sullinger, who was 40 years old at the time of the hearing, has a ninth grade education and past relevant work experience as a cashier, stocker, housekeeper, and factory worker. [R. 14 at 2; Tr. 62, 85-86, 230-234, 240, 272.]

In evaluating a claim of disability, an ALJ conducts a five-step analysis. See 20 C.F.R. 416.920. First, if a claimant is working at a substantial gainful activity, they are not disabled. 20 C.F.R. § 416.920(b). Second, if a claimant does not have a severe impairment, they are not disabled. 20 C.F.R. § 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix I, they are disabled. 20 C.F.R. § 416.920(d). Fourth, if a claimant's impairments do not prevent them from performing past relevant work, they are not disabled. 20 C.F.R. § 416.920(e). Fifth, if a claimant's impairments (considering residual functional capacity, age, education and past work) prevent them from performing

other work that exists in the national economy, then they are disabled. 20 C.F.R. §

416.1520(f).

In this action, at Step 1, the ALJ found that Sullinger had not engaged in

substantial gainful activity since the alleged onset date of November 1, 2006. [2] [Tr. 14.]

At Step 2, the ALJ found that none of Sullinger's physical impairments, when considered

individually, constitute a "severe" impairment. However, she found that when they are

considered in combination, Sullinger has the following "severe" impairments: "cervical

and lumbar spine degenerative disc disease; left shoulder degenerative joint disease; a

mood disorder; and an anxiety disorder." [Tr. 14-15.] ALJ Smith found that Sullinger's

"history of hysterectomy and complaints of chest pain" were "non-severe." [Tr. 15.] At

Step 3, the ALJ found that Sullinger does "not have an impairment or combination of

impairments that meet or medically equals one of the listed impairments" in the

regulations. [Tr. 15-16.] At Step 4, the ALJ determined that Sullinger possessed the

residual functional capacity ("RFC") to perform light work in accordance with the

following restrictions:

> the claimant could perform overhead reaching with her dominant right upper
> extremity; however, she should perform no frequent overhead work with her left
> upper extremity (thus only occasional overhead work on the left side). Further,
> the claimant could understand and remember simple instructions; sustain attention
> for simple tasks for extended periods of two-hour segments in an eight hour
> workday; and adapt to changes as needed. Finally, the claimant could tolerate co-
> workers and supervisors in a non-public setting.

[Tr. 17.] At Step 5, the burden of coming forward with evidence shifted to the

Commissioner to identify a significant number of other jobs in the economy Sullinger

could perform. *Jones*, 336 F.3d at 474. Here, the ALJ concluded that Sullinger is

---

[2] ALJ Smith found that Sullinger met the "insured status requirements of the Social Security Act through
December 31, 2007, but not thereafter." [Tr. 14; R. 15 at 1.]

"capable of performing her past relevant work as a cleaner/housekeeper and handpacker."
[Tr. 25.] Accordingly, on July 18, 2011, the ALJ issued an unfavorable decision, finding
that Sullinger was not disabled, and therefore, not eligible for DIB or SSI. [Tr. 9-28.]
The Appeals Council found no reason for review [Tr. 1-5] and Sullinger now seeks
judicial review in this Court.

## II

This Court's review is limited to whether there is substantial evidence in the
record to support the ALJ's decision. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d
611, 614 (6th Cir. 2003). "Substantial evidence" is "more than a scintilla of evidence but
less than a preponderance; it is such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d
284, 286 (6th Cir. 1994); see also *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th
Cir. 2010). The substantial evidence standard is deferential as it "presupposes that there
is a zone of choice within which decision makers can go either way, without interference
from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). In determining the
existence of substantial evidence, courts must examine the record as a whole. *Id*.
However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or
make credibility determinations. *Id*. Rather, if the Commissioner's decision is supported
by substantial evidence, it must be affirmed even if the reviewing court would decide the
matter differently and even if substantial evidence also supports the opposite conclusion.
*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Sullinger presents three arguments on appeal to this Court. First, she argues that
the ALJ erred by "picking and choosing from the evidence" which Sullinger contests

allowed the ALJ to "incorrectly conclude" that she had an issue with drugs and/or alcohol abuse. [R. 14 at 8.] She further argues the ALJ violated its own procedures in considering the evidence of her prescription usage. [*Id.*] Second, Sullinger argues the ALJ improperly weighed the medical opinions regarding her physical condition when she discounted the opinions of a treating-physician, Dr. Gary Shearer and relied upon the opinions of ME, Dr. Lorber. [R. 14 at 12-16 (referring to Tr. 12-16).] Finally, Sullinger argues that the ALJ improperly discounted her credibility. [R. 14 at 16.]

## A

Sullinger argues that ALJ Smith selectively considered evidence, and wrongfully concluded, in contravention of SSA policy, that Sullinger was addicted to drugs and alcohol. [R.14 at 8-12.] Sullinger's argument fails for two distinct reasons.

The Court recognizes that "neither this Court nor the ALJ 'may [ ] focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence.' " *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004) (quoting *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978)). In other words, an ALJ "may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale" for the decision. *Id.* However, as has already been explained, s*upra* II, this Court is limited to deciding whether the Commissioner's decision, "is supported by substantial evidence and was made pursuant to proper legal standards." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (citing *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007)). "If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion." *Id.* "The

Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion." *Putman v. Astrue*, 2009 WL 838155 at *5 (E.D. Tenn. Mar. 30, 2009); see also *Her*, 203 F.3d at 389-90. Thus, even if Sullinger is correct that substantial evidence also supports her conclusion, that would not justify granting her motion for summary judgment so long as substantial evidence of the record also supports the conclusion of the ALJ.

Sullinger's belief that the ALJ's sole consideration was Sullinger's "drug seeking behavior" is unfounded. While the accusation of "picking and choosing evidence" might sound sinister, context is important. The ALJ's job is to sort through a lengthy, complicated, and often contradictory, record to "pick and choose" what medical evidence is best supported and most credible. Sullinger had the opportunity to present all of her evidence before the ALJ and persuade her that it favored giving controlling weight to Dr. Shearer. The ALJ disagreed, finding Dr. Shearer's assessment to be inconsistent with the record. This Court is not to conduct a *de novo* review but to consider solely whether the ALJ's decision is supported by substantial evidence. As will be demonstrated, the ALJ's decision is supported by substantial evidence. Further, where the ALJ did "pick and choose" from an opinion, she offered sufficient rationale to support her decision. *Young*, 351 F. Supp. 2d at 649.

Sullinger argues that, because of the ALJ's above discussed "picking and choosing," the ALJ misapplies Social Security Ruling ("SSR") 13-2p in concluding that Sullinger has a problem with Drug and/or Alcohol abuse. This argument also fails. First, the argument is based on a faulty premise. The ALJ never concluded that Sullinger was

addicted to drugs.  While one might evaluate the record evidence and so suspect, this

certainly was not a conclusion drawn by the ALJ.  This initial mistake leads Sullinger to

misinterpret, and ultimately misapply, SSR 13-2p.  In SSR 13-2p, the SSA explains its

policies and procedures for considering "whether 'drug addiction and alcoholism' (DAA)

is a contributing factor material to our determination of disability."  *Soc. Sec. Ruling, Ssr

13-2p.; Titles II & Xvi: Evaluating Cases Involving Drug Addiction & Alcoholism (Daa)*,

SSR 13-2P (S.S.A Feb. 20, 2013).   They explain that:

> The key factor we will examine in determining whether drug addiction or
> alcoholism is a contributing factor material to the determination of disability is
> whether we would still find a claimant disabled if he or she stopped using drugs
> or alcohol.

*Soc. Sec. Ruling, Ssr 13-2p.; Titles II & Xvi: Evaluating Cases Involving Drug Addiction

& Alcoholism (Daa)*, SSR 13-2P (S.S.A Feb. 20, 2013).  Sullinger is mistaken, however,

in believing that the ALJ's discussion of her usage of prescription medications is

governed by this SSR.  ALJ Smith never found that Sullinger suffered from DAA.

Further, she did not construe any doctor's opinion to so diagnose Sullinger.  There was

never any attempt by the ALJ to make a DAA materiality determination.  Had ALJ Smith

sought to justify denying disability on a finding that Sullinger was suffering from DAA

then the above described SSR would apply.  Rather, ALJ Smith solely considered

Sullinger's tendencies to both misreport her usage of prescription-medications to medical

professionals and to use prescription-medications instead of other forms of treatment, as

evidence of lapses in her credibility.  [Tr. 21-22.]

## B

Sullinger argues that ALJ Smith failed to properly weigh the medical opinions in

this case.  [R. 14 at 12.]  Specifically, Sullinger argues that ALJ Smith erred, first, by not

accepting the opinion of treating physician, Dr. Gary Shearer and, second, by placing

"little weight" on Dr. Shearer's opinions.  [R. 14 at 12-16.]

**1**

The Regulations provide the Social Security Administration's framework for

evaluating the opinions of a treating source:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in your case record, we will give it
> controlling weight.  When we do not give the treating source's opinion
> controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and
> (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through
> (c)(6) of this section in determining the weight to give the opinion.  We
> will always give good reasons in our notice of determination or decision
> for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(c)(2).  Thus, although the opinion of a treating source is not

necessarily binding, an ALJ is required to set forth some basis for the decision to reject a

treating source opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *see also*

*Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 725 (6th Cir. 2004) (noting that in cases

where the treating physician rule applies, a reviewing court must evaluate whether the

ALJ gave good reasons for his decision not to give controlling weight to a treating source

opinion, as required by the governing Regulation).  Therefore, as Sullinger's treating

physician, Dr. Shearer's opinion on the issues of the nature and severity of Sullinger's

impairments is given controlling weight only if it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with

other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).[3]  If the treating source's

---

[3] This cited provision is now located at 20 C.F.R. § 404.1527(c)(2).

opinion is not given controlling weight then the ALJ is required to consider the following factors in deciding exactly how much weight is to be given to the opinion: length of the treatment relationship as well as the frequency of examinations, the nature and extent of the treatment relationship, the supportability of the medical opinion, the consistency of the opinion and the degree of specialization of the treating source. 20 C.F.R. § 404.1527(c)(2)(i-ii), (c)(3-6); *Turner v. Comm'r of Soc. Sec.*, 267 F. App'x 456, 460 (6th Cir. 2008); *Wilson,* 378 F.3d at 544. Furthermore, the ALJ is required to give "good reasons" for not giving weight to opinions from the treating physician in a disability determination. 20 C.F.R. § 404.1527(c)(2). The purpose of this requirement is to "let claimants understand the disposition of their cases," to "ensure[] that the ALJ applies the treating physician rule," and to "permit[] meaningful review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at \*5; *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)); see also *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013).

Dr. Gary Shearer has treated Sullinger from February 2008 to the time of her application. [R. 14 at 13; Tr. 24.] Sullinger conveys in her motion that Dr. Shearer's opinion was that she was "limited to a reduced range of sedentary, part-time work." [R. 14 at 13 (citing Tr. 850-584).] The Court notes that Dr. Shearer uses language far more limiting in making his recommendation, stating that Sullinger is "totally and permanently disabled." [Tr. 852, 854.] Sullinger argues the ALJ erred by not giving more weight to Dr. Shearer's opinion on disability, which she argues is supported by the following substantial objective evidence:

These objective findings include arthritic changes in Plaintiff's left shoulder found in the June 20, 2008 MRI (Tr. 336 or 877); "moderate facet hypertrophy[] throughout the lumbar spine" on an x-ray taken on February 20, 2008 (Tr. 416, 771, or 885); degenerative changes at multiple levels of the cervical spine found on cervical spine MRIs dated March 28, 2008 and January 4, 2010 (Tr. 568-569 or 872 and 770 or 876); a DEXA bone density study dated January 8, 2009 which confirmed osteopenia (Tr. 601 or 874); and findings on a September 28, 2010 bone scan including minor scoliosis in the mid-thoracic spine, patella baja, arthritis in the ankles and mid-feet more marked on the left, and obstructive uropathy affecting the right kidney (Tr. 869). Other objective findings noted repeatedly during Dr. Shearer's physical examinations of Plaintiff include positive straight leg raise tests, decreased strength in Plaintiff's right foot/toe, tenderness to palpation of her lumbar spine and left AC joint, tenderness in her SI joints and lumbar musculature, decreased grip strength bilaterally, paraspinal muscle tightness in her neck, reduced reflexes in both arms and in both legs, and painful reduced range of motion in her left shoulder and lumbar spine (Tr. 339-419, 605-744, 855-886).

[R. 14 at 14.] Again, the Court's role is to review whether there is substantial evidence in the record to support ALJ Smith's decision. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). The substantial evidence standard is deferential as it "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This means that even when the evidence could support another conclusion, the decision must stand if the evidence reasonably supports the ALJ's conclusion. *See Her*, 203 F.3d at 389-90; *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

ALJ Smith "places little weight on the medical source statements offered by Dr. Shearer in July of 2008 and March of 2011." [Tr. 23 (referring to Tr. 356 (July 2008), 852 (March 2011)).] She explains that "Dr. Shearer opined that the claimant's physical residual functional capacity was severely more restricted than the finding reached in this decision, and concluded that the claimant was totally and permanently disabled." [Tr. 23.] ALJ Smith concluded that, despite Dr. Shearer's status as a treating physician, "his

opinion is not entitled to controlling weight because it is neither well supported, nor consistent with the substantial evidence of record." [Tr. 24; R. 15 at 12.] Unlike her counterpart in *Wilson*, ALJ Smith did not stop with a summary conclusion, but went on to provide concrete examples of significant inconsistencies between the findings of Dr. Shearer and other substantial, medical evidence of record.

In March 2011, Dr. Shearer provided a "poor" prognosis for Sullinger. [Tr. 850.] He opined that Sullinger suffered from neck, arm, back, and leg pain. [*Id*.] In response to a question about how often Sullinger's "pain or other symptoms" are "severe enough to interfere with attention and concentration needed to perform…simple work tasks" he responded, "constantly." [Tr. 851.] He further provided that Sullinger is not capable of performing "even 'low stress' jobs" and that she would not be able to walk two city blocks without rest or severe pain. [Tr. 852.] According to Dr. Shearer, Sullinger is severely restricted in her ability to sit, stand, lift, move her head, twist, stoop, crouch, squat, climb ladders or climb stairs. [Tr. 852-853.] Further, Dr. Shearer advises that Sullinger is severely limited in her ability to grasp, turn, or twist objects with her hands, use her fingers to manipulate things, and to reach with her arms. [Tr. 854.] In the opinion of Dr. Shearer, Sullinger is "totally and permanently disabled." [Tr. 854.] The ALJ considered these opinions and concluded that they were neither well-supported by medically acceptable clinical and laboratory diagnostic techniques, nor consistent with other substantial evidence.

First, with regard to clinical and laboratory diagnostics, ALJ Smith noted Dr. Shearer's routine findings of "musculoskeletal and neurological deficits" were inconsistent with diagnostic evidence. [Tr. 24.] ALJ Smith cited objective evidence

demonstating that Sullinger's left shoulder revealed only "mild tendinosis and mild acromioclavicular degeneration." [Tr. 23, 18 (citing Tr. 879 (Radiology results reveal "Mild AC degeneration and a type 2 acromion contributes to mild lateral arch narrowing and predisposes to outlet-related cuff impingement"), 886 (Radiology results from St. Luke indicate "Minor degenerative change, AC joint").] This diagnosis was endorsed by Dr. Lorber. [Tr. 23.]

ALJ Smith also noted that, contrary to Dr. Shearer's diagnosis of "multi-level cervical disc disease with thecal sac compression," [R. 855-870] the objective evidence revealed only "minimal discogenic changes and no evidence of thecal sac impression." [Tr. 24, 408, 569.] ALJ Smith noted that images of Sullinger's lumbar spine showed "Moderate facet hypertrophy" but showed "No evident fracture, subluxation, destructive process or anomaly." [Tr. 18, 24, 416.] Medical expert, Arthur Lorber, M.D., concluded the above-referenced "Moderate facet hypertrophy" was age appropriate. [Tr. 23, 104-105.] Sullinger complained that her lower legs tingled when crossed but, as noted by the ALJ, a March 4, 2008, EMG resulted in normal findings that provided "No evidence of significant neuropathy, plexopathy or radiculopathy." [Tr. 18, 413-414.] ALJ Smith considered the findings of a MRI of Sullinger's cervical spine, conducted on March 28, 2008. [Tr. 408.] Findings were normal except for "minimal discogenic changes…which minimally indent the ventral aspects of the thecal sac…without evidence of cervical cord or nerve root compression." [Tr. 408.]

With regard to Sullinger's cervical spine, objective testing consistently arrived at the same conclusion. On February 20, 2008, St. Luke's noted the following about Sullinger's cervical spine: "Unremarkable plain film study of cervical spine." [Tr. 415 or

4F at 77.] A second study was conducted on December 1, 2009 and the following comments were provided following that procedure: "Cervical spine and disc spaces normal and unchanged from prior study." [Tr. 591.] Finally, Radiology results from January 4, 2010 revealed "Minimal uncovertebral degenerative changes. No evidence of disc bulge or protrusion." [Tr. 569.]

The Commissioner also noted that Dr. Shearer concluded Sullinger had significant limitations with fingering or fine manipulations with her hands. [Tr. 854.] Dr. Shearer concluded Sullinger would be limited in using either of her hands for fine manipulations to 10% of the time in an 8-hour workday. [Tr. 854.] Contrastingly, Consultative Examiner Pawel Starzyk noted that Sullinger's "finger manipulation is good" and went on to add that she can "use a pencil without problem." [Tr. 453.]

Second, ALJ Smith also identified a number of inconsistencies between Dr. Shearer's opinions and other substantial evidence in the record. [Tr. 24.] ALJ Smith noted that Sullinger's treatment has remained "conservative in nature" and that she has "not received the type of aggressive medical care one would expect for allegedly disabled individual prescribed large quantities of narcotic pain medication." [Tr. 20.] For example, Sullinger does not require any ambulatory assistance, nor does she "require[] ongoing care from a specialist, frequent emergency treatment, or any type of rehabilitative surgery." [Tr. 20.] This conservative treatment regimen is not consistent with Dr. Shearer's opinion of "total and permanent disability." See *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1001 (6th Cir. 2011) ("modest treatment regimen…was inconsistent with a finding of total disability"); *Myatt v. Comm'r of Soc. Sec.,* 251 F. App'x 332, 335 (6th Cir. 2007) ("Dr. Kleykamp's modest treatment regimen

… is inconsistent with a diagnosis of total disability.")  The ALJ also noticed that, despite alleging disabling shoulder pain since November of 2006, Sullinger never sought treatment for that pain prior to December 30, 2007.  [Tr. 18, 326.]  The treatment notes accompanying that Emergency Room visit note "normal range of motion," "no obvious soft tissue swelling," and "no acute findings of a fracture or dislocation."  [Tr. 326.]

Dr. Shearer's opinions are also completely inconsistent with Sullinger's daily activities.  In October, 2008, Sullinger provided a description of her daily regimen, which included preparing multiple meals in a day, walking her kids to school, cleaning the house and shopping for groceries.  [Tr. 21, 426.]  In her hearing, she explained that she is limited in many of her activities but goes to church every week, grocery shops on occasion and also goes to the park with her kids.  [Tr. 21, 94]  ALJ Smith noted that Sullinger reported to Dr. Shearer on October 29, 2010, that because she was splitting up with her husband, she was "doing a lot of moving."  [Tr. 20, 863.]  Also noteworthy is that Sullinger is capable of, and still does, drive.  [Tr. 251, 97-98.]  These activities of daily living are not activities that one would expect from a person who is deemed "totally and permanently disabled."  "As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain."  *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (citing *Crisp v. Secretary of Health and Human Services,* 790 F.2d 450, 453 (6th Cir. 1986)); See also *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (Citing *Blakley,* 581 F.3d at 406.) (Where ALJ gave little weight to treating physician's opinion because doctor's assessment conflicted with evidence demonstrating claimant "was able to engage in significant daily activities and … maintain part-time employment.")  Sullinger's daily activities fly in the

face of Dr. Shearer's findings about her limitations and serve as further evidence of the inconsistency between Dr. Shearer's opinion and the record as a whole.

**2**

Because Dr. Shearer's opinion was not given controlling weight, the ALJ was required to consider the following factors in deciding exactly how much weight to give his opinion: length of the treatment relationship as well as the frequency of examinations, the nature and extent of the treatment relationship, the supportability of the medical opinion, the consistency of the opinion and the degree of specialization of the treating source. 20 C.F.R. § 404.1527(c)(2)(i-ii), (c)(3-6); *Turner v. Comm'r of Soc. Sec.*, 267 F. App'x 456, 460 (6th Cir. 2008); *Wilson,* 378 F.3d at 544. Sullinger argues that ALJ Smith committed legal error when she failed to explicitly address these factors. [R. 14 at 15.] While ALJ Smith did not outline the 20 C.F.R. § 404.1527 factor analysis in her decision, she did address these factors in great detail. The Sixth Circuit addressed this situation and found no error, in *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006), despite the fact that the ALJ did not explicitly address the 1527(c) factors. The Sixth Circuit noted that "the ALJ's evaluation of Nelson's … impairments indirectly attacks both the supportability of Dr. Cook's and Dr. Peterson's opinions and the consistency of those opinions with the rest of the record evidence." *Nelson*, 195 F. App'x at 470; See also *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) (Referring to the 20 C.F.R. § 404.1527(d)(2) factors, the Court recognized "[a]lthough the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis.' " (citing §

404.1527(d)(2)); See also *Horak v. Astrue*, 3:08-CV-347, 2010 WL 797915 (E.D. Tenn. Mar. 3, 2010) (Despite fact that ALJ did not specifically lay out the 20 C.F.R. § 404.1527 factor analysis, he did address both the inconsistency and lack of evidentiary basis for the doctor's opinion in deciding his assessment was entitled no weight. The Court found that even if the ALJ erred by failing to expressly consider the other factors, the error was harmless.)

While ALJ Smith did not outline the 20 C.F.R. § 404.1527 factors, she did address these factors throughout the course of her decision. The ALJ notes that Sullinger saw Dr. Shearer "approximately once a month to have her prescriptions refilled." [Tr. 19.] Furthermore, it is obvious from the records that Shearer and Sullinger saw each other frequently. Sullinger concedes, that Dr. Shearer is a general practitioner while Lorber is an orthopedist. [R. 15 at 15.] Ultimately, however, these factors are not controlling. ALJ Smith's critique was most centrally focused on the inconsistency and lack of supportability of Dr. Shearer's opinion as well as the nature of the treating relationship between Dr. Shearer and Sullinger. [Tr. 24 (Dr. Shearer's "opinion is not entitled to controlling weight because it is neither well supported, nor consistent with the substantial evidence of record."]

A medical opinion's consistency with the "record as a whole" is one of the factors to be considered in evaluating the weight of medical opinions. See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). As explained in the preceding analysis, ALJ Smith presented significant objective evidence from the record that was inconsistent with the Dr. Shearer's medical source statement and, on more than one occasion, ALJ

Smith explicitly referred to the inconsistency. For example, the ALJ stated that "[a]ttending physician, Gary Shearer, M.D., reported findings wholly inconsistent with the objective evidence." [Tr. 19.] On another occasion she expressed her belief that "his findings were completely inconsistent with the diagnostic and electro-diagnostic evidence." [Tr. 24.] Dr. Lorber very directly disagreed with Dr. Shearer's opinions. [Tr. 99-103.] Also, as previously discussed, Dr. Shearer's opinions were wholly inconsistent with Sullinger's daily activities. [R. 15 at 14.]

ALJ Smith also question the supportability of Dr. Shearer's opinion. See 20 C.F.R. § 404.1527(c)(3) ("Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). For reasons provided earlier, this Court agrees that Dr. Saylor's claims are properly discounted as they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(3); 20 C.F.R. § 404.1527.

Finally, ALJ Smith also commented directly on "the nature and extent of the treatment relationship" between Dr. Shearer and Sullinger. [Tr. 20.] The regulations specifically identify that one of the items to be considered is "the treatment the source has provided." 20 C.F.R. § 404.1527(c)(2)(ii). She talked extensively about the conservative nature of treatment and how Sullinger has "not received the type of aggressive medical care one would expect for allegedly disabled individual prescribed large quantities of narcotic pain medication." [Tr. 20.] Due to problems with the nature of Dr. Shearer's

treatment, the inconsistency of his opinions with other record evidence, and the lack of supportability of his opinions, ALJ Smith was justified in according it little weight. Further, ALJ Smith's explanation is sufficiently detailed to enable Sullinger to understand why her treating physician's opinion was granted little weight and also to permit judicial review. *Wilson,* 378 F.3d at 544 ; *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006).

After ALJ Smith accorded little weight to Dr. Shearer's opinions, she was free to evaluate the remaining medical opinions. 20 C.F.R. 404.1527. The Sixth Circuit has recognized that " 'in appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.' " *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96–6p, 1996 WL 374180 (1996)). The ALJ found the opinions of Dr. Timothy Gregg and Dr. Arthur Lorber were entitled to "great weight." [Tr. 23.] ALJ Smith found Dr. Gregg's conclusions consistent with the objective medical evidence in the record. [Tr. 23.] Furthermore, she noted that "Dr. Lorber had the advantage of reviewing the full longitudinal record" and that his "opinion was well supported as well as well as consistent with the findings established by the State agency." [Tr. 23.] For all the reasons explicated herein, and for the further reasons provided in the ALJ Smith's decision, her evaluations regarding the weight accredited to medical testimony were supported by substantial evidence.

## C

Sullinger's final complaint is that the ALJ improperly assessed her credibility.
[R. 14 at 16-17.] It is the functional limitations imposed by a condition, not the mere diagnosis that determine disability. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis [of a condition], of course, says nothing about the severity of the condition."). For this reason, the Commissioner considers statements or reports from the claimant when determining whether a claimant is disabled. 20 C.F.R. § 404.1529. To determine whether statements of a claimant regarding symptoms, including pain, are credible, ALJs employ the following two-part test:

> First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)) (internal citations omitted). In 20 C.F.R. § 404.1529, the Social Security Administration informs claimants that, in certain situations, "[b]ecause symptoms, such as pain, are subjective and difficult to quantify," the following factors should guide the analysis of agency decision makers when determining the severity of an impairment:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529; *see also, Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994).

Importantly, it is within the province of the ALJ, rather than the reviewing court, to

evaluate the credibility of claimant. *Rogers*, 486 F.3d at 247 (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981)). Even so, the credibility determinations of the ALJ must be reasonable and supported by substantial evidence. *Id.* at 249.

The ALJ cited the correct test and found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible." [Tr. 17.] The ALJ goes on to provide many examples of inconsistencies in the way Sullinger has sought treatment, questions regarding her daily activities and questions surrounding her use of prescription narcotics that call into question Sullinger's credibility.

First, in an October, 2008, consultative examination with Ms. Yass Reed, Sullinger reported that she had been receiving mental health treatment from NorthKey every other week for approximately six weeks. [Tr. 21, 422.] She even went so far as to critique the therapy at Northkey, stating that it might be helping some but did not really "have a focus." [Tr. 422.] The treatment records from NorthKey indicate that Sullinger's last session at Northkey was October 19, 2007. [Tr. 21, 313.] Sullinger was not forthright with Ms. Yass Reed and it gives the ALJ reason to question her credibility.

Second, ALJ Smith notes that Sullinger's daily activities are inconsistent with the disability that she alleges. The regulation is clear that a claimant's "daily activities" may be considered in judging credibility. 20 C.F.R. § 404.1529. In her meeting with Ms. Yass Reed, Sullinger described her daily regimen, which included preparing multiple

meals in a day, walking her kids to school, cleaning the house and shopping for groceries. [Tr. 21, 426.]  In her hearing, she explained that she is limited in many of her activities but does goes to church every week, grocery shop some and also goes to the park sometimes with her kids.  [Tr. 21, 94.]

Third, ALJ Smith explains that "the credibility of the claimant's allegations of pain and functional limitations is further undermined by her significant narcotic pain medication use."  [Tr. 21.]  This is relevant as the regulation informs claimants that "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" may be considered in determining severity of impairment.  20 C.F.R. § 404.1529.  The ALJ may also consider "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms.  20 C.F.R. § 404.1529.  The Court need not review all the identified inconsistencies in Sullinger's prescriptions history to affirm that the ALJ's decision is supported by substantial evidence, especially because credibility determinations are within the province of the ALJ.  *Rogers*, 486 F.3d at 247 (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997)

The first concerning episode identified by the ALJ took place in May of 2008.  On May 5, Sullinger received Percocet from Dr. Caroline Bohme. [Tr. 21, 763, 765.]  On May 20, she got another sixty Percocet pills from Dr. Shearer.  [Tr. 21, 360.]  Then eight days later, on May 28, Dr. Bohme received a message from the pharmacy, indicating that Sullinger had asked for an early refill because she had run out of Percocet.[4]  [Tr. 21, 764.]  Notably, the above evidence is to be contrasted with a letter penned by Dr. Shearer on

---

[4] Sullinger explains in her brief why that she needed to get a refill on her Ativan (also known as Lorazepam).  This explanation, however, does not address the issue the ALJ raises with regard to Percocet.  [R. 14 at 10-11.]

June 29, 2011 where he defends Sullinger's prescription usage. In that letter he states that Ms. Sullinger has "not attempted to obtain prescriptions from another physician." [Tr. 898.] This is clearly not true, for the reasons already stated. Sullinger even concedes in her motion that before October 2008, she obtained her medications from more than one source. [R. 14 at 18.] This is further corroborated by the Kasper Report that ALJ Smith asked Sullinger to provide. [Tr. 899.] Dr. Shearer also reflects on the Kasper report, "I have recently pulled a Kasper report and it was appropriate." [Tr. 898.] This is also not true. In addition to the above noted discrepancy, the ALJ also noted multiple prescriptions in June, 2008, and in November, 2009. [Tr. 22, 899-900.] Finally, the letter also includes Dr. Shearer's assurance that he normally drug tests patients "at least every 3 to 6 months." [Tr. 898.] Sullinger stated in her hearing that Dr. Shearer requires she drug test, "Not very often" and continues, "I think I've only been drug tested a couple of times going there." [Tr. 92.]

The Court also notes that, on November 26, 2009, Sullinger went to St. Luke Hospital for knee pain and informed the personnel at St. Luke's that she was prescribed Percocet but had run out. [Tr. 593.] What she failed to inform them, however, was that only 18 days before, on November 8, she had received a prescription for 240 percocets from Dr. Shearer. [Tr. 20, 593, 651.] Noticeably, she also failed to mention that she was receiving Xanax from Dr. Shearer. [Tr. 20, 593, 651.]

The Court also notes Sullinger's claim that she does not have an issue with prescription drug abuse [Tr. 61] despite admitting that she has overdosed in the past. [Tr. 61 ("the only time I OD'ed is I had a breakdown a few years ago…And I tried to kill myself"), 423.] Sullinger's Counsel even conceded that there has been a question of

whether Sullinger has appropriately used her medication in the past. [Tr. 69, "And in the past, there is – I agree, there has been a question of whether the use of her medication is inappropriate.)] While the ALJ did not depend on this particular inconsistency in discounting her credibility, the Court notes it as further evidence of a lapse in credibility.

Finally, ALJ Smith noted that Sullinger chose to rely on medication rather than have surgery for her injured shoulder. [Tr. 21-22.] Sullinger's brief refers to *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) for the proposition that "[n]oncompliance with medical treatment may be considered when determining a claimant's credibility, but the fact that a claimant has trouble affording his medications is not an acceptable reason to hold his noncompliance against him." [R. 14 at 17 (citing *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990).] Noticeably absent from Sullinger's brief, however, is any indication or suggestion that that Sullinger could not afford the surgery. Based on Sullinger's own interpretation of *McKnight*, her non-compliance (if that is what it is deemed to be) may properly be considered.

Sullinger's primary argument is not, however, that she did not comply with the Doctor's orders and should somehow be excused or forgiven. Rather, Sullinger attempts to pin her inability to have remedial surgery wholly on Dr. Colosimo. She argues that Dr. Colosimo would not perform the surgery until Sullinger quit smoking. [R. 14 at 19.] It is true that Dr. Colosimo made fixing her shoulder contingent on her agreement to "work on stopping smoking," and ALJ Smith recognizes this in her decision [Tr. 22] but Sullinger's is not completely forthright with her explanation. Dr. Colosimo also expressed his concern about Sullinger's other habits: "Lisa's a patient I'm really, really worried about. She's been taking a lot of pain medicine." [Tr. 479.] Further, when

asked by ALJ Smith why she would not have the surgery, Sullinger responded, "I'm just scared to have it…I'm afraid that I'm not going to be able to use my arm…I'm just really terrified to do something like that." [Tr. 89-90.] Finally, Sullinger indicates that, after Dr. Colosimo's discussion with her about the importance of quitting smoking, she attempted to quit but had been unable to as of the date of the hearing. [R. 14 at 19.] Sullinger's appointment with Dr. Colosimo was on February 5, 2009 and her first hearing date was December 16, 2010. [Tr. 479, 53.] Almost two years had passed and Sullinger chose to continue smoking and taking pain medicine over getting her shoulder repaired.

ALJ Smith employs the proper test in her analysis and she directly and explicitly addresses factors that the agency has bound itself to consider. In so doing, ALJ Smith conducted a proper credibility determination, which the Court's independent review has found to be reasonable and supported by substantial evidence from the record.

### III

Thus, after reviewing the record, the Court finds that the ALJ's decision finding Sullinger not disabled is supported by substantial evidence. Moreover, even if the evidence could also support another conclusion, the ALJ's decision must stand because the evidence reasonably supports her conclusion. *See Her*, 203 F.3d at 389-90; *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, and the Court being sufficiently advised, it is hereby ordered as follows:

(1) Plaintiff's motion for Leave to File her Summary Judgment Motion *Instanter* and in Excess of the Page Limitations [R. 13] is **GRANTED**;

(2) Plaintiff's motion for Summary Judgment [R. 14] is **DENIED**;

(3) Defendant's Motion for Summary Judgment [R. 15] is **GRANTED**; and,

(4) **JUDGMENT** in favor of the Defendant will be entered contemporaneously herewith.

This 31st day of March, 2014.

Signed By:

*Gregory F. Van Tatenhove*

United States District Judge